AO 106 (Rev. 06/09) Application for a Search Warrant

FILED    LODGED

RECEIVED

**NOV 17 2010**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*  )    Case No. MJ10- 5191
SEE ATTACHMENT A                              )
                                              )
                                              )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated herein by reference

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2, which are incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Unlawful Dealing Firearms |

The application is based on these facts:

See attached Affidavit of Special Agent Heidi Wallace, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Heidi Wallace, Affiant
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/17/10

_____
*Judge's signature*

City and state: Tacoma, Washington

J. RICHARD CREATURA, U.S. Magistrate Judge
*Printed name and title*

Nick Brown

**AFFIDAVIT**

STATE OF WASHINGTON    )
                       )   ss
COUNTY OF PIERCE        )

I, HEIDI WALLACE, being first duly sworn, do hereby depose and say:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Seattle, Washington, Field Office. I have been an ATF Special Agent since 2003. As such, I have conducted numerous investigations of violations of federal firearms laws. Prior to becoming a Special Agent, I worked at the ATF laboratory in Ammendale, Maryland, for a year and a half as an Integrated Ballistics Identification System (IBIS) Specialist. I have a Bachelor's Degree in Sociology from the University of Michigan, and have completed the Federal Law Enforcement Training Center Criminal Investigators program, the ATF New Professional Training for Special Agents program and the ATF Advanced Interstate Nexus of Firearms and Ammunition course.

2.      As a result of my training and experience as an ATF Special Agent, I am familiar with federal criminal laws governing firearms. I know that Title 18, United States Code, Section 922(a)(1)(A), makes it unlawful for any person except a licensed importer, manufacturer or licensed dealer to engage in the business of dealing in firearms or in the course of such business to ship, transport or receive any firearm in the interstate or foreign commerce. This Affidavit is based upon my own investigation, as well as upon information provided to me, and my review of reports prepared by other law enforcement personnel.

3.      I make this Affidavit in support of an application for a warrant to search the residences of the following individuals:

      a.      Mark SKILES, located at 651 Alder Creek Ln NE, Belfair,

1  Washington 98528, as more fully described in Attachment A;

2        b.     Kenneth GUSSONI, located at 140 Broad St W, Bremerton,

3  Washington 98312, as more fully described in Attachment A;

4        c.     Roy S. ALLOWAY located at 9468 Phillips Rd SE, Port Orchard,

5  Washington 98367, as more fully described in Attachment A and

6        d.     David DEVENNEY, located at 9610 Old Highway 99, Olympia,

7  Washington 98501, as more fully described in Attachment A.

8        The Affidavit is submitted in support of the application to search the above

9  residences and seize the items more fully described in Attachments B-1 and B-2, which

10  are attached to this Affidavit and incorporated herein by reference.  As set forth below,

11  there is probable cause to believe that each residence contains evidence of the following

12  violation of federal law: Title 18, United States Code, Section 922(a)(1)(A).  This

13  Affidavit is submitted solely for the purpose of establishing probable cause for the search

14  warrant and does not purport to set forth all of my knowledge of, or investigation into, the

15  offense.

16  **FEDERAL FIREARM LICENSING AND RELATED LAWS**

17        4.     A Federal Firearms License (FFL) is a license that enables an individual or

18  a company to engage in a business pertaining to the manufacture and/or sale of firearms

19  and ammunition.[1]  Having an FFL is a prerequisite for "engaging the in the business" of

20  firearm sales.

21        5.     Title 18, United States Code, Section 922(a)(1) states in pertinent part:

22  It shall be unlawful . . . for any person except a . . . licensed dealer to engage in the
    business of dealing in firearms . . .

23

    The term "engage in the business of" is defined as:

24

25  . . . a person who devotes time, attention, and labor to dealing in firearms as a
    regular course of trade or business with the principal objective of livelihood and
    profit through the repetitive purchase and resale of firearms, but shall not include a

26  person who makes occasional sales, exchanges, or purchases of firearms for the
    enhancement of a personal collection or for a hobby or who sells all or part of a

27

28     [1]  The term FFL is used to mean both a federal firearms license and federal firearms licensee.
The term will be used interchangeably through out this affidavit.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1        personal collection.

2   18 U.S.C. § 921(c).

3        The term "principal objective of livelihood and profit" means:

4            . . . that the intent underlying the sale or disposition of firearms is
         predominantly one of obtaining livelihood and pecuniary gain, as opposed to other
5        intents, such as improving or liquidating a personal firearms collection: *Provided,*
         That proof of profit shall not be required as to a person who engages in the regular
6        and repetitive purchase and disposition of firearms for criminal purposes or
         terrorism.
7
    18 U.S.C. § 921(a)(22).
8
9        6.       Any time an FFL sells a firearm, the purchaser is required to fill out an ATF

10  Form 4473. **See Attachment C.** FFL's are required to maintain all 4473s  Additionally,

11  an FFL must report every handgun sold to the State of Washington Department of

12  Licensing, firearms section who maintains records of all handguns sold in the state based

13  upon the reports filed by the FFL. Another ATF requirement involves multiple sales of

14  firearms. When an individual purchases two or more handguns from an FFL, the FFL

15  must fill out a Multiple Sales Form and send a copy to the ATF. **See Attachment D.** A

16  separate Washington State pistol transfer form is completed anytime a handgun in

17  purchased in the state of Washington from a licensed dealer. This form includes

18  information about the purchaser, firearm and which dealer sold the firearm and when. A

19  copy of this is mailed to the Washington State Department of Licensing and to local law

20  enforcement of where the purchaser lives.

21                        **SUMMARY OF INVESTIGATION**

22       7.       In approximately May 2009, ATF agents initiated an investigation into the

23  unlawful firearms dealing by individuals at local gun shows in the Western District of

24  Washington. The ATF was able to determine that some of the weapons sold at these gun

25  shows were subsequently used during the commission of crimes in the area. Undercover

26  agents attended various gun shows and observed numerous "private sellers" selling guns.

27  It became obvious that many of these private sellers were in the business of selling

28  firearms and not simply selling guns from their private collection. This observation was

    based on the number of firearms they had displayed, the type of firearms they had for

Search Warrant Affidavit - SA Wallace - 3

1   sale, and the manner in which they were displayed.  The ATF also noticed that some

2   individuals regularly rented space at the gun shows, always had a large number of

3   handguns for sale, and rarely generated any paperwork other than a written receipt

4   required at certain gun shows.  During the course of the investigation, multiple ATF

5   Undercover Agents (UC) attended these various gun shows posing as interested weapons

6   purchasers and carrying surveillance equipment.  In most instances, the conversations

7   between ATF UCs and the individuals discussed in this Affidavit either audio or video

8   recorded.

9   **MARK SKILES AND KENNETH GUSSONI INVESTIGATION**

10      8.      Two of the targets of this investigation are Mark SKILES and Kenneth

11   GUSSONI.  On February 10, 2003, SKILES applied for a Federal Firearms License with

12   the ATF.  In his application he indicated that he intended to sell new and used firearms

13   for a profit.  SKILES further stated that he intended to store his firearms in a commercial

14   gun safe in the bedroom of his residence.  He also denied that he was currently engaged in

15   a business requiring a Federal Firearms License.

16      9.      On May 6, 2003, ATF Inspector Sandra Sherlock met with SKILES

17   regarding his application.  She reviewed the Acknowledgment of Federal Firearms

18   Regulations with him, ATF Forms (including Form 4473), and the record keeping

19   requirements.  She inquired about the nature of his activity to determine if it constituted

20   engaging in the business of dealing firearms and advised SKILES of the applicable laws

21   and regulations regarding conduct of business.  He was also provided a copy of the

22   Federal Firearms Regulations.  This book of regulations contains the definition of

23   who is a "dealer" and the meaning of "engaging in the business" of dealing firearms.

24   **Dealer.** Any person engaged in the business of selling firearms at wholesale
      or retail; any person engaged in the business of repairing firearms or of making or

25   fitting special barrels, stocks, or trigger mechanisms to firearms; or any person
      who is a pawnbroker. The term shall include any person who engages in such

26   business or occupation on a part-time basis. 27, CFR, *Section 478.11*

27   **Dealer in firearms other than a gunsmith or a pawnbroker.** A person who
      devotes time, attention, and labor to dealing in firearms as a regular course of trade

28   or business with the principal objective of livelihood and profit through the
      repetitive purchase and resale of firearms, but such a term shall not include a

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.  27 CFR, *Section 478.11*

2

3    10.    The inspector also covered the regulations regarding sales of firearms at a

4    gun show.  This states:

5    **Conduct of business away from licensed premises. (a) (1)** A licensee may conduct business temporarily at a gun show or event as defined in paragraph (b) if the gun show or event is located in the same State specified on the license: **Provided,** that such business shall not be conducted from any motorized or towed vehicle. The premises of the gun show or event at which the licensee conducts business shall be considered part of the licensed premises. Accordingly, no separate fee or license is required for the gun show or event locations. However, licensees shall comply with the provisions of § 478.91 relating to posting of licenses (or a copy thereof) while conducting business at the gun show or event.

6

7

8

9

10    11.    After reviewing the law, the requirements, and regulations with Skiles she

11    noted the following: "The applicant was attentive of his FFL responsibilities" and that he

12    "appears to have a good understanding of his responsibilities as an FFL."

13    12.    In June 2003, SKILES was issued an FFL through the ATF.  The name of

14    the business was "M&J Services."   SKILES' license remained active until July 2006,

15    when the license expired without a renewal request.

16    13.    In May 2009, I received an ATF Multiple Sales (MS) report that showed

17    Mark SKILES had recently purchased nine handguns from a particular gun store in

18    Tacoma, Washington.  According to this database, SKILES had purchased the following

19    firearms within the six months prior to May 2009:

20    •    December 18, 2008, two handguns
       •    March 20, 2009, five handguns
21    •    March 26, 2009, eleven handguns
       •    March 28, 2009, two handguns
22    •    April 15, 2009, eleven handguns
       •    April 24, 2009, twelve handguns
23    •    April 30, 2009, nine handguns

24    14.    In total, Mark SKILES had purchased fifty-two (52) firearms in this six-

25    month period.  Out of the fifty-two handguns purchased, fifty were purchased from one

26    FFL in Tacoma.  Fourteen handguns were manufactured by Cobra Enterprises, six by

27    Taurus, six by Phoenix Arms,  and remaining firearms from numerous other

28    manufacturers that make inexpensive handguns.

UNITED STATES ATTORNEY
700 Stewart Street, Suite S220
Seattle, Washington 98101-1271
(206) 553-7970

1    15.    When purchasing these firearms from a licensed dealer (FFL), SKILES was

2    required to complete and sign an ATF Form 4473. This form is required to be filled out

3    by every individual who purchases a firearm from a FFL. The first page and second page

4    is filled out by the purchaser. Other than the signature block for the purchaser, the rest of

5    the second page and part of a third page are completed by the dealer.[2] The additional

6    pages include definition, notices and instructions pertaining to the form. In the section on

7    the second page, immediately above the buyer's signature there is a sentence that states,

8    "I further understand that the repetitive purchase of firearms for the purpose of resale for

9    livelihood and profit without a Federal firearms license is a violation of the law (See

10   Instructions for Question 16)." Under Question 16 on page 5 of the form, the definition

11   of "Engaged in the Business" under Title 18 U.S.C. Section 922(a)(1) is stated.  It also

12   states that a "license is not required of a person who only makes occasional sales,

13   exchanges, or purchases of firearms for the enhancement of a personal collection or for a

14   hobby or who sells all or part of his or her personal collection of firearms." Thus, every

15   time SKILES filled out and signed this form, he acknowledged the wording on the form

16   and was advised that selling firearms for a profit without a federal firearms license was

17   illegal.

18    16.    On June 19, 2009, MS forms indicated that SKILES purchased eight

19   firearms from an FFL, including six Cobra Enterprise .38 caliber Derringer pistols and

20   two Romarm pistols.

21    17.    On June 20, 2009, an ATF Undercover Agent (UC-1) attended the Centralia

22   Gun Show located at the Southwest Washington Fairgrounds. Prior to entering the show,

23   I told the UC about SKILES' purchases of multiple firearms and showed him a

24   Washington drivers license photo of SKILES. The UC-1 entered the gun show, identified

25   SKILES behind one of the tables, and started looking at the firearms.  SKILES had

26   multiple Derringer pistols of similar manufacturer and model which all appeared to be

27

28    [2]  By signing the form, the purchaser is attesting to the truthfulness of the information and acknowledges the other information contained in the form.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  brand new.  The UC-1 purchased a .22 caliber Derringer pistol for $200 from SKILES.

2  He asked SKILES for a business card or contact information in case something was

3  wrong with the gun.  In a recorded conversation, SKILES said he didn't have any

4  business cards because he was a private seller, but then added that nothing should be

5  wrong with the gun because it was brand new and had never been fired.  The firearm

6  purchased was a Cobra Enterprises, model C22MSW, with serial number 039676.  A

7  receipt was provided to the UC-1, but no additional paperwork.

8      18.    On June 20, 2009, ATF UC-2 went to the Centralia Gun Show to look for

9  previously identified subjects who were suspected of dealing without a firearms license.

10  While at the show the UC-2 identified SKILES by the photograph I showed him before he

11  entered the show.  The UC-2 also noticed a second subject at the same table as SKILES

12  who later introduced himself as "Ken."  "Ken" was subsequently identified as Kenneth

13  GUSSONI.  The UC-2 observed approximately ten long guns and approximately fifteen

14  handguns on display for sale.  The majority of handguns included a 3"x5" card with a

15  short description of the handgun and the sales price.

16      19.    While UC-2 watched the table, both GUSSONI and SKILES participated in

17  the sales that occurred at their table.  For example, when an unknown individual came up

18  to purchase a firearm at the table, GUSSONI told the buyer about the firearm and

19  SKILES took the money and wrote out a receipt.  UC-2 spoke to GUSSONI about the

20  different firearms at the table.  GUSSONI stated he was from Bremerton and that both he

21  and SKILES work many gun shows together and would have a table at the next Puyallup

22  gun show.

23      20.    UC-2 purchased an Intratec model Tec-9 with serial number A023973 and a

24  Cobra Enterprises, .22 caliber Derringer pistol with serial number CT068298.  GUSSONI

25  described the advantages and disadvantages both firearms to the UC.  SKILES took the

26  money from GUSSONI (who originally got it from the UC-2) and wrote out a show

27  receipt for the firearms.  On the back of the receipt GUSSONI wrote his cell phone

28  number and told  UC-2 to call if he wanted any additional firearms or if there was any

1  problem with them.  Before UC-2 left the table he noted the serial number for a Charter

2  Arms firearm that was displayed.  The serial number was 93473.

3    21.    The following week, I compared the firearms purchased or viewed by the

4  UCs at SKILES' table with those listed on the MS records I previously obtained.  The MS

5  records showed that SKILES purchased the Cobra Enterprise with serial number 039676

6  on April 30, 2009, and the other Cobra on June 19, 2009.  The Tec 9 was purchased by

7  another individual other than SKILES in January 2009.  The Charter Arms with serial

8  number 93473 that was viewed by the UC at his table was purchased by SKILES on April

9  24, 2009.  I believe this information is significant because it illustrates the SKILES

10  bought and sold these firearms within a two month period, consistent with his repetitive

11  sale of firearms for a profit.

12    22.    MS forms indicate that on July 31, 2009, SKILES purchased four handguns

13  from an FFL, which included three Keltec pistols and one Jennings pistol.  The MS forms

14  list the residence in Belfair, Washington, as SKILES' current residence.

15    23.    MS forms indicate that on October 23, 2009, SKILES purchased six

16  handguns from an FFL, which included two Cobra Enterprise Derringers very similar to

17  the previous ones he purchased.  The MS forms list the residence in Belfair, Washington,

18  as SKILES' current residence.

19    24.    On November 7, 2009, another ATF UC-3 attended the Washington Arms

20  Collector (WAC) gun show in Monroe, Washington.  I gave the UC-3 information about

21  SKILES and his recent purchases on October 23, 2009.  I also gave him information

22  about GUSSONI and told him that he usually sells firearms at the same table with

23  SKILES.  UC-3 approached a table and recognized GUSSONI standing behind it.  He

24  then started looking through the handguns that were on the table.  He noted that there

25  were approximately twenty handguns for sale and then found two of the firearms that I

26  had described to him.  The price tag on each read $260.  GUSSONI told UC-3 that the

27  handguns were new and had never been fired.  UC-3 asked GUSSONI how much for both

28  handguns and he replied $475.  UC-3 purchased both handguns, two Cobra Enterprises,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 model CLB 38, .39 caliber Derringers with serial number CT069183 and CT063928.

2 SKILES was not present during this transaction.

3    25.    After UC-3 left the gun show, I checked the serial numbers of the firearms

4 purchased by UC-3 and discovered that both firearms were purchased on October 23,

5 2009, by Mark SKILES. Again, this type of short turnaround between the purchase of

6 firearms by SKILES and subsequent sale is indicative of unlawful dealing in firearms.

7    26.    On November 7, 2009, UC-1 attended the WAC gun show in Monroe,

8 Washington. UC-1 was also given information about SKILES and GUSSONI prior to the

9 gun show. UC-1 entered the gun show and located a table that GUSSONI was standing

10 behind. UC-1 noted that several handguns in new condition were on the table. SKILES

11 was also present at the table when the UC-1 attempted a purchase. SKILES recognized

12 UC-1 from a previous purchase he made from him on June 20, 2009. UC-1 contacted

13 GUSSONI about purchasing a .380 caliber Derringer. In a recorded conversation,

14 GUSSONI stated that he did not have any .380 caliber Derringers on his table, but told

15 the UC-1 "I'll see what I can do." GUSSONI also mentioned that he would be at the next

16 Puyallup gun show on November 14, 2009. The UC-1 left without making a purchase.

17    27.    On November 14, 2009, an ATF UC-4 contacted GUSSONI at the WAC

18 gun show in Puyallup, Washington. UC-4 asked GUSSONI if paperwork needed to be

19 filled out if he purchased a firearm. In a recorded conversation, GUSSONI told him

20 because it would be a private sale, just as if he sold the firearm on the street to UC-4. The

21 UC asked GUSSONI questions about him selling at gun shows. GUSSONI told UC-4

22 that he could no longer work a regular job, so this was his source of income. UC-4 asked

23 GUSSONI if he made enough to "put food on the table" and he said he did. After this

24 brief discussion, UC-4 left the table to observe the rest of the show, but returned to

25 GUSSONI's table a little later on. UC-4 decided to purchase a Citadel, model 1911A1,

26 .45 caliber pistol with serial number CIT001631. Next to this firearm was a 3"x5" card

27 that said "never fired" and a sales price of $550. GUSSONI told UC-4 that he would give

28 him a good price for the firearm and UC-4 asked what that would be. GUSSONI said that

1  he would sell it for $525 and UC-4 countered with $500 and GUSSONI shook the hand

2  of the UC signifying it was a deal.  UC-4 paid GUSSONI $500 and GUSSONI removed

3  the 3" x 5" card and put the firearm in a gun box.  UC-4 continued to converse with

4  GUSSONI about how he (the UC) could start selling firearms at the gun shows.

5  GUSSONI told UC-4 to walk around the gun shows looking for good deals, buy some

6  firearms, and resell them at a profit.  He also told UC-4 to buy firearms from friends and

7  acquaintances to build up an inventory.  GUSSONI told UC-4 that he attends about 42

8  gun shows per year.

9       28.     MS forms indicated that on March 11, 2010, Mark SKILES purchased four

10  handguns from an FFL in Tacoma, Washington.  He purchased two Cobra Enterprises,

11  .45 caliber pistols and two .22 caliber pistols.  The MS forms list the residence in Belfair,

12  Washington, as SKILES' current residence.

13       29.     MS forms indicated that on March 26, 2010, SKILES purchased four

14  handguns from the same FFL in Tacoma, Washington.  Two pistols and two revolvers

15  were purchased by SKILES of various calibers and manufacturers.  The MS forms list the

16  residence in Belfair, Washington, as SKILES' current residence.

17       30.     MS forms indicated that on April 23, 2010, SKILES purchased eight

18  handguns from the same FFL in Tacoma, Washington.  Two of the handguns were Bersa,

19  model Thunder, .380 caliber pistols, three 9mm pistols including two Smith & Wesson,

20  Sigma models and a Beretta, model M9, two revolvers and two other pistols that were of

21  different calibers and manufacturers.  The MS forms list the residence in Belfair,

22  Washington, as SKILES' current residence.

23       31.     On May 14, 2010, SKILES purchased an additional four handguns from the

24  same FFL in Tacoma, Washington.  This purchase of firearms included two 9mm pistols,

25  a .45 caliber pistol and a .38 caliber revolver all of various makes and models.  Again, the

26  MS forms also list the residence in Belfair, Washington, as SKILES' current residence.

27       32.     On May 15, 2010, UC-4 contacted SKILES and GUSSONI at their table at

28  the WAC gun show in Puyallup, Washington.  In a recorded conversation, SKILES began

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   talking to the UC as he looked at the firearms displayed on the table. SKILES told UC-4

2   that he bought "used" firearms from an FFL. These firearms were usually firearms

3   returned to the FFL after buying it new. The FFL would in turn sell the firearms to

4   SKILES "used" for the FFL's cost (wholesale price) and then SKILES would re-sell them

5   at the gun shows. SKILES said that he had an arrangement with the FFL because once a

6   firearm leaves an FFL it can not be re-sold as "new" even if the firearm was never fired.

7   This arrangement with the FFL not only allowed him to make a profit, but it also kept the

8   FFL from taking a loss on the firearm. SKILES said that all of his firearms came from an

9   FFL, but he did not tell UC-4 which one it was.

10       33.     SKILES then told UC-4 that he had been an FFL at one time. SKILES

11   complained about the process of becoming an FFL, saying it took too long to process his

12   paperwork and described the record keeping requirements associated with having an FFL.

13   SKILES described the paperwork needed to handle MS sales and said that overall the

14   paperwork was too much hassle. SKILES preferred "private sales" because they did not

15   require any paperwork. SKILES stated that with the money he has made at gun shows,

16   combined with a disability pension, he could make a living. SKILES also stated he does

17   some gunsmithing on the side. UC-4 left the table after having this conversation.

18       34.     A short time later, UC-4 returned and GUSSONI was standing behind the

19   tables adjoining SKILES' and watching over SKILES' tables while he was away. UC-4

20   talked to GUSSONI about their tables and GUSSONI said that he and SKILES were

21   partners and that he had the authority to negotiate prices for SKILES firearms. Soon

22   SKILES returned and UC-4 selected two firearms to purchase, a Hi Point, .45 caliber

23   pistol with serial number X4128414 and a S&W, Sigma model, 9mm pistol with serial

24   number DST1344. UC-4 asked how much it would be to purchase both firearms, and then

25   he watched as both of them decided on a price. UC-4 noticed that although both firearms

26   were on tables in front of SKILES, the S&W, Sigma was GUSSONI's firearm and so he

27   had to agree on the price. When a price of $600 for both firearms was agreed upon,

28   GUSSONI shook the hand of the UC. UC-4 paid GUSSONI for the firearms. SKILES

Search Warrant Affidavit - SA Wallace - 11

1   said that no additional paperwork was needed, but that he could write him up a bill of sale

2   if needed, but the UC declined.  Before leaving the table, UC-4 told SKILES that he was

3   interested in possibly selling firearms.  SKILES recommended that he find an FFL, like

4   he did, who would funnel "used" firearms to him for resale.  SKILES then pointed at

5   GUSSONI and told him to learn about it from GUSSONI because he was a great teacher

6   on the subject.  Both men told UC-4 that they would be at the gun show in

7   Chehalis/Centralia the following weekend.

8        35.    On May 22, 2010, UC-4 attended the gun show in Centralia, Washington.

9   UC-4 stopped at the table where GUSSONI was standing and noticed several handguns

10   displayed.  UC-4 asked him if "his partner" (SKILES) was at the show and GUSSONI

11   said no.  UC-4 asked GUSSONI if any FFL would sell returned inventory to him like they

12   did for SKILES.  In a recorded conversation, GUSSONI said that usually "mom and pop"

13   stores were more likely to work with someone on re-sales of returned inventory but that

14   larger stores were less likely to make such an agreement.  UC-4 then left the table only to

15   return a short time later.  Stopping back at GUSSONI's table, UC-4 picked out two

16   firearms of interest.  A Ruger, model LCP, .380 caliber pistol with serial number 373-

17   40511and a Rohm, .38 caliber Derringer with serial number 34599.  GUSSONI said the

18   Ruger was "on consignment" and he had no flexibility on the price.  Then GUSSONI said

19   he would take $510 for both.

20        36.    UC-4 then told GUSSONI that he sold the previous gun he had bought from

21   GUSSONI to a member of an Outlaw Motorcycle Club and that one of these guns he was

22   purchasing was going to the same buyer.  GUSSONI then gave the UC a brief history of

23   that Club but did not seem concerned that he was supplying them with firearms.  UC-4

24   said that he needed to acquire more firearms because of the requests he was getting from

25   the Club and asked GUSSONI if he would fill orders for firearms.  GUSSONI replied that

26   it would depend on what they wanted and what was available.  UC-4 then asked

27   GUSSONI if, similar to SKILES, he bought firearms from an FFL.  GUSSONI stated that

28   he preferred to buy his guns from people "outside the gate" and from people walking by

Search Warrant Affidavit - SA Wallace - 12

1   during the show.  UC-4 asked why he didn't choose to acquire his firearms the same way

2   as SKILES and he said that SKILES' method works for SKILES and that his method

3   works for him and that if the UC got into business of selling firearms he might be still

4   different then both of them.

5       37.    GUSSONI said that he fires most of the firearms on his table to make sure

6   they are operational before he sells them to someone else.  He also said that he tries to

7   acquire special firearms that he always has wanted and gave an example of the type of

8   firearm.

9       38.    UC-4  asked GUSSONI if he could contact him so that the UC could learn

10  how to sell firearms at gun shows, and GUSSONI gave the UC his number.  UC-4 asked

11  what kind of work schedule he had so they could work around those hours and GUSSONI

12  replied, "what work?".  GUSSONI said he was retired and on disability and that he was

13  normally available Monday-Thursday and on Fridays he was usually on the road to a gun

14  show.  He said he was going to be at a flea market in Packwood, Washington next

15  weekend and at another gun show in Puyallup the weekend after that.

16      39.    During the next week, I checked MS records for the Ruger pistol and Rohm

17  Derringer purchased by the UC on May 22, 2010, and I discovered that one firearm was

18  purchased by another individual on April 13, 2010, and the Rohm did not appear in MS

19  records.

20      40.    MS records reveal that on July 9, 2010, SKILES purchased two handguns

21  from the FFL in Tacoma.  These firearms included a Bersa, .380 caliber pistol and a High

22  Standard, .22 caliber pistol.  The MS forms list the residence in Belfair, Washington, as

23  SKILES' current residence.

24      41.    On August 7, 2010, UC-2 attended the WAC gun show in Puyallup,

25  Washington.  UC-2  located a table run by GUSSONI and SKILES and watched it for a

26  little while before approaching.  He observed GUSSONI acting as the main seller of the

27  firearms, until a second customer would arrive and then SKILES would assist.  There

28  were approximately 15-20 handguns and about 10 long guns at the table.  UC-2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   approached the table and started talking to GUSSONI.  GUSSONI said that he had new

2   and used guns for sale and that currently business was "not bad."  UC-2 asked both of

3   them whether they had any Colt Python model pistols and they each said no.  GUSSONI

4   said that he comes across one every once in a while, but that it would cost the buyer some

5   money to purchase the handgun (meaning they are not cheap).  UC-2 then purchased a

6   Ruger, .38 caliber revolver with serial number 540-27161 from GUSSONI for $425  The

7   money was handed to GUSSONI.  In a recorded conversation, UC-2 asked about the gun

8   he just purchased, and GUSSONI said he has had it about three weeks, but that he has

9   never fired it.  When asked why he got rid of the gun so fast, GUSSONI said "I buy them

10  and then sell them."  UC-2 responded, "So it's about the money?" and GUSSONI replied,

11  "It's all about the money."  UC-2 then asked if any paperwork needed to be filled out and

12  he replied "not with me, I don't do paperwork."  UC-2 left the table.

13      42.     Also on August 7, 2010, the same UC-4 that contacted GUSSONI in May

14  2010 attended the WAC gun show in Puyallup, Washington.  UC-4 recognized

15  GUSSONI standing behind the table and SKILES seated behind a different table adjacent

16  to GUSSONI's table.  At first it was unclear whether SKILES and GUSSONI each had a

17  separate table or if they were working two tables at this show.   UC-4 noticed about 15-20

18  handguns on the table in front of GUSSONI.  There were approximately 15 long guns in

19  racks on two tables near SKILES and a couple of handguns in front of where SKILES

20  was sitting.  When UC-4 first approached the table, SKILES was on the phone.  After  he

21  hung up the phone, SKILES told GUSSONI that he was just talking to the Lakewood

22  Police Department who had recovered one of his firearms.

23      43.     SKILES told GUSSONI that it was a firearm that "we" purchased from

24  Mary's Guns.  SKILES went on to say that someone either did something very bad with it

25  or someone possessed it who was not supposed to have it.  SKILES commented that he

26  was going to have to call the police officer later to discuss the situation further.  UC-4

27  asked SKILES if the firearm had been stolen from them and SKILES said no.  Next UC-4

28  asked SKILES how the officer knew to contact him and SKILES said that he always

Search Warrant Affidavit - SA Wallace - 14

1    registered his firearms in his name with the State. However, he did not register any of the

2    firearms in his "personal collection." SKILES stated that what he possessed in his

3    personal collection was none of their business (referring to the government). Based on

4    my training and experience, I believe this is significant because it distinguishes SKILES'

5    personal collection of firearms from those he sells for profit (without an FFL) at the gun

6    shows.

7       44.    In a recorded conversation with UC-4, GUSSONI told the UC that he did

8    not have any firearms linked to him through paperwork. GUSSONI's source for firearms

9    was different from SKILES' source. GUSSONI said that he acquired most of his

10    firearms from estate sales. GUSSONI added that he had firearms on consignment at

11    numerous other tables at the gun show. GUSSONI then went on to explain to UC-4 some

12    of the methods he uses to gain a profit at the gun shows. One way that he makes money

13    from firearms is to trade up for firearms he wanted, and he gave UC-4 an example of

14    trading a Springfield XD pistol for an H&K pistol. But GUSSONI says that he never

15    trades a firearm for another, each sale involves cash. He added that if someone really

16    wanted the firearm bad enough, they will trade a firearm of higher value for it.

17    GUSSONI told UC-4 that the highest profit margin was on cheap firearms, and he used

18    an example of a Bryco .380 caliber pistol. He said that he could acquire those pistols for

19    less than $100 and sell them for more. GUSSONI then gave a few examples of what he

20    meant by pointing to guns at his table. He said he had about $50 into the Bryco and that

21    he was trying to sell it for $230. He pointed out a Raven, .25 caliber pistol that he had

22    $65 invested he was selling for $165. Lastly, GUSSONI pointed to a particular Bauer

23    pistol he had on this table for $185. He said someone could sell it for $225.

24       45.    GUSSONI said he would be willing to help UC-4 get started into selling

25    firearms since the UC asked him for some guidance. UC-4 then decided to buy the three

26    firearms that GUSSONI had pointed out. The total price was $500 for all three firearms,

27    which included ; a Bryco model 48, .380 caliber pistol with serial number D58387, a

28    Raven, MP22, .22 caliber pistol with serial number 357504 and a Bauer, .25 caliber pistol

Search Warrant Affidavit - SA Wallace - 15

1  with serial number 047562.  One of these firearms (the Bauer pistol) appeared on MS

2  records, but the purchaser was neither SKILES or GUSSONI and the date of purchase

3  was October 28, 2009.

4      46.    UC-4 then told GUSSONI a story about how he and a friend in Alaska

5  worked at a gun show and how someone with a firearms license at another table hassled

6  the UC's friend about needing a license to sell firearms.  UC-4 asked GUSSONI what the

7  laws were about dealing in firearms.  GUSSONI told UC-4 that he would have told the

8  FFL to "kiss my ass."  GUSSONI said that people sell firearms in different ways, just like

9  he and SKILES acquire their firearms in different ways.  GUSSONI said that some

10  people obtain a license because they choose to have a business versus himself who was a

11  private party.  GUSSONI said that these people had a business because the firearms were

12  their livelihood.  GUSSONI said that he chose to be a private party dealer and not obtain

13  a license.  He went on to say that it was too much of a hassle to deal with the

14  requirements, including the paperwork and the records he had to maintain.  Furthermore,

15  he said that ATF could come in to look at a licensee's records "24/7 and 365 days a year."

16  UC-4 asked why anyone would want to get a license then.  GUSSONI said that by having

17  a license, a dealer could purchase firearms for 1/3 the price most people pay for them.

18  The license then made it easier for a dealer to build in his profit margin, but people like

19  himself had to work harder to make a profit on a firearm sale.

20      47.    On a later date I was able to locate the Lakewood police report that

21  corroborated the phone call SKILES had at the gun show.  The report involved the arrest

22  of an individual for unlawful possession of a firearm (because the subject arrested was a

23  convicted felon) and Domestic Violence Assault 4.  The firearm was recovered on August

24  6, 2010, from a vehicle and it was described as a Springfield X9, 9mm with serial number

25  06100187.  A records search showed that this firearm was purchased by SKILES on

26  March 26, 2009, from an FFL in Tacoma.  Based on the conversations overheard by the

27  UC on August 7, 2010, it appears that either SKILES and/or GUSSONI sold the firearm

28  after SKILES acquired it.

Search Warrant Affidavit - SA Wallace - 16

1     48.    On January 19, 2010, there was an officer involved shooting north of

2  Seattle.  ATF was asked to assist in tracing the firearms.  One of the firearms was traced

3  back to a subject who told the investigating ATF agent that he sold the firearm in question

4  to Ken GUSSONI approximately three years ago.  The same subject said that GUSSONI

5  regularly has firearms for sale at various gun shows.

6     49.    GUSSONI was contacted by the ATF agent and asked about the firearm.

7  GUSSONI admitted to having the firearm at some point, but stated that he had sold

8  numerous firearms at gun shows throughout the years and was not able to locate any

9  receipts or documentation as to whom he sold the firearm.

10     50.    On July 1, 2010, I received information from the Employment Security

11  Department about the past wages reported on Mark SKILES between 2003 to the present.

12  The results showed that the last recorded wages were in 2006 and they totaled less than

13  $15,000.  There were no records for 2009 or 2010.  Though it is difficult to determine

14  exactly what SKILES paid for each of the firearms he has purchased, since the values for

15  firearms vary often and because of his arrangement with an FFL, as a rough estimate

16  based on the used values of firearms he has spent over $23,000 on acquiring firearms

17  since January 1, 2009.  I am not aware of any businesses that SKILES may be associated

18  with where he could store firearms, documents, or business records pertaining to the sale

19  or acquisition of firearms.

20     51.    I also received information from the Employment Security Department

21  about the past wages reported on Kenneth GUSSONI between 2003 to the present.  The

22  results showed that there was no records for GUSSONI between that range.  I conducted

23  a search through the Washington Department of Licensing to see if GUSSONI had a

24  business license to sell firearms.  The only entry I located was a Kenny GUSSONI with

25  Soner Construction that was opened on 1/1/2007 and closed 12/31/2009.  Soner

26  Construction did not have a business license to sell firearms.  The address listed for the

27  business is the same address that is listed on GUSSONI's Washington drivers license, his

28  home residence.  I also conducted a check of Kenneth GUSSONI through the ATF

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   licensing database on October 19, 2010, and received no records back indicating that

2   GUSSONI ever had or attempted to receive a federal firearm license. I am not aware of

3   any businesses that GUSSONI may be associated with where he could store firearms,

4   documents, or business records pertaining to the sale or acquisition of firearms.

5                                          **ROY ALLOWAY INVESTIGATION**

6          52.     Roy ALLOWAY is a former police officer.[3]  During the course of the

7   investigation, ATF noticed that he and an associate, Troy Wiktorek Sr., were purchasing a

8   large number of guns and frequenting gun shows.  At some point in early to mid 2006,

9   ATF Special Agent Brad Devlin contacted ALLOWAY and Troy Wiktorek Sr. because of

10  the volume of guns they were selling at gun shows.  SA Devlin explained that they were

11  violating the law by dealing firearms without a license in violation of 18 USC §

12  922(a)(1)(A).

13         53.     Thereafter, on approximately August 16, 2006, ALLOWAY and his partner,

14  Wiktorek, who was then also a police officer, applied for a Federal Firearms License, not

15  as individuals but as a limited liability corporation.  They filled out a written application

16  which they both signed.  In the application, they indicated that they intended to engage in

17  the business of selling new and used firearms for a profit.  They also indicated that they

18  did not intend to use their license to acquire personal firearms.  Their business, a limited

19  liability corporation was to be called Renegade Guns and Loans.

20         54.     On October 3, 2006, as part of the application process, an ATF Inspector

21  met with ALLOWAY and Wiktorek to interview them regarding their application.  The

22  inspector discussed the federal regulations with the applicants and spent time on ATF

23  form 4473 - firearms transaction form and their obligation to fill out the Report of

24  Multiple Sales form.  The inspector also discussed what it meant to be in engaged in the

25  business of selling firearms under 27 CFR Section 478.11 and the Federal Firearms

26  License booklet which includes 18 U.S.C. §§ 922(a) through (z) and 921 (the definitions

27

28

---

[3] Alloway retired from law enforcement in May 2010.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 section of the Gun Control Act of 1968).[4]  Their license was issued in late 2006.

2      55.     The inspector discussed sale of guns at a gun show by FFLs.  They were

3 informed that FFLs can sell firearms at a gun show but must comply with federal firearms

4 regulations which included requiring the buyer to fill out ATF Form 4473 and to perform

5 a background check on the potential purchaser.[5]

6      56.     Additionally, ALLOWAY and Witorek were advised about their

7 requirements regarding the sale of personal firearms they obtained from their business

8 inventory.  Under 27 CFR  § 478.125a, an FFL, who is a sole proprietor, can transfer

9 firearms from their business inventory to themselves to add to their personal collection.

10 The FFL is not required to fill out a form 4473 when transferring the firearm to their

11 personal collection but must keep a record of this transaction.[6]  He/she is also required to

12 keep a book detailing the purchase and sale of personal firearms which came from the

13 business inventory.  Additionally, the FFL may only sell a personal firearm transferred to

14 him/ her after a one year period.  This option of transferring firearms to one's personal

15 collection does not apply to FFL's doing business as a limited liability corporation.  In

16 ALLOWAY's case, once he purchases firearms from the LLC, these firearms are treated

17 as a individual personal purchase from the FFL and he is required to fill out a 4473 for

18 each firearm purchased from his own company.

19      57.     Prior to receiving their FFL, based upon MS records, I learned that from

20 2004 to 2006 Wiktorek had purchased 53 handguns and ALLOWAY had purchased 26

21 firearms.  After they received their license, there were no further MS records from

22 Wiktorek from November 2006 to the present.  However, the MS records for ALLOWAY

23

24      [4]  See paragraphs 9 and 10 above for the definitions set forth in ATF Regulations § 478.11.

25      [5]  Under ATF Regulation § 478.100 - Conduct of business away from licensed premises- an FFL
26 is entitled to temporarily conduct business at a gun show as long as the gun show is located in the same
State specified on the FFL's license.  They are required to post their license, fill out a Form 4473 for
27 each firearms sale, and conduct background checks.

      [6]  Additionally, a FFL is not required to fill out a form 4473 when obtaining firearms from
28 another FFL if it is for their business inventory.  However, if an FFL purchased a personal firearm from
another FFL, he would have to fill out the 4473.

1  show that he has purchased 40 firearms since receiving the FFL.  Further, the MS forms

2  list the residence in Port Orchard, Washington, as ALLOWAY's current residence.

3      58.    Since 2008, the ATF form 4473 has included a section that informs

4  purchasers of the rules and regulations regarding repetitive purchases of firearms and

5  engaging in the business of dealing in firearms.  As previously described in paragraph 14

6  above, anyone who wants to purchase a firearm from a FFL must complete a Form 4473.

7  In the section on the second page, right above the buyer's signature there is a sentence

8  that states "I further understand that the repetitive purchase of firearms for the purpose of

9  resale for livelihood and profit without a Federal firearms license is a violation of the law

10  (See Instructions for Question 16)."  Under Question 16 on page 5 of the form, the

11  definition of Engaged in the Business under Title 18 U.S.C. Section 922(a)(1) is stated.

12  Thus, every time ALLOWAY purchased a firearm from an FFL, he filled out and signed

13  this form he acknowledged the wording on the form and knew that his actions were

14  "engaging in the business" and therefore needed a license.

15      59.    On July 18, 2009, an ATF UC-5 contacted ALLOWAY at the Centralia

16  Gun show.  UC-5 asked ALLOWAY about the firearms at his table and he stated that

17  some of the firearms were used, but others were in "like new" condition.  UC-5 purchased

18  a Springfield model XD, .45 caliber pistol with serial number US776604 for $450 and a

19  Walther, model P22, .22 caliber pistol with serial number L025833 for $325  After the

20  purchase was completed, ALLOWAY handed the UC-5 a business card that stated in

21  large letters at the top of the card "Got Guns?" with his name and a phone number

22  underneath it.  The phone number listed was not to Renegade Guns and Loans, LLC.

23      60.    On October 24, 2009, an ATF UC-6 observed ALLOWAY at the

24  Washington Arms Collectors (WAC) gun show in Puyallup selling firearms at a table that

25  had approximately 60 handguns and 30 rifles.  ALLOWAY's table was connected to

26  another table that had other firearms on it and a male and female standing behind it.  UC-

27  6 noticed that the price tags associated with the different firearms were in different colors,

28  so he asked the female behind the table what that meant since the other male subject and

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   ALLOWAY were busy.  She responded by saying the green color meant it was a new gun

2   and the orange meant it was used.  UC-6 noticed a sign that said "private sales" sitting on

3   one of the tables.  He asked the female what part of the table was private and she pointed

4   to an area next to where ALLOWAY was.  UC-6 started looking at the numerous firearms

5   at ALLOWAY's table.  He got ALLOWAY's attention and inquired about the history of

6   a Glock pistol that was on the "private sales" side of the table.  ALLOWAY stated that

7   the Glock handgun was one of his personal firearms and that it had night sights and came

8   with "high cap" magazines.  UC-6 purchased the Glock, model 21, pistol with serial

9   number DWZ966US and 40 rounds of .30 caliber ammunition for $550.

10       61.   On November 14, 2009, UC-5 attended the WAC gun show in Puyallup.  At

11   the gun show they approached ALLOWAY's table and started asking him about the

12   firearms at his table.  ALLOWAY had 3-4 tables full of private sales firearms and he was

13   sharing the area with another 3-4 tables belonging to an FFL.  UC-5  noticed two other

14   people working the other table adjacent to his table.  UC-5 purchased a Keltec, .223

15   caliber pistol with serial number POP72.

16       62.   On July 27, 2010, I received a referral from the Seattle ATF Intelligence

17   group regarding Roy ALLOWAY.  An inspection of Renegade Guns & Loans LLC,

18   located in Shelton, Washington, was recently completed by ATF Industry Operation

19   Investigators (IOI).  From this inspection, ATF IOI's discovered a large amount of

20   purchases made by ALLOWAY.  From reviewing the ATF form 4473 and Acquisition

21   and Disposition records held by the FFL, the IOI's were able to determine that from

22   November 2006 through May 2010, ALLOWAY acquired approximately 163 firearms

23   through Renegade Guns & Loans in his individual capacity, not as a FFL.  The majority

24   of the firearm transfers occurred the same day or within one day of the acquisition date by

25   the FFL.  In other words, the firearm was taken in by Renegade Guns and Loans, and

26   transferred to ALLOWAY the same day or within one day.

27       63.   The IOI also noticed that there was no apparent pattern in the type of

28   firearms ALLOWAY was acquiring.  Some of his acquisitions were handguns including

1  Glocks, Hi-points and Berettas, and other times he purchased long guns which included

2  SKS models, AR-15 models and AK-47 modeled rifles.  From May 2009 through April

3  2010, ALLOWAY purchased 30 long guns from the shop.  The Inspector also did a

4  search of handgun purchases recorded in Washington State and determined that since

5  January 2005, ALLOWAY had purchased 224 handguns from Renegade Guns and Loans

6  and other various FFLs.

7       64.    ALLOWAY has been seen at the gun show on multiple occasions and each

8  time he was selling firearms as a private seller.  Typically, his table was set up next to the

9  tables set up by Renegade Guns & Loans LLC.  There was never any paperwork ever

10  filled out during any of ATF's undercover purchases for firearms from ALLOWAY.  On

11  one occasion an ATF UC did see ALLOWAY obtain change, for a purchase he made

12  from his "private sales" table, with the money box that looked to belong to Renegade

13  Guns and Loans at the adjoining tables.

14       65.    From reviewing the paperwork included in the referral, I noticed that the

15  Glock pistol with serial number DWZ966US, purchased at the gun show by UC-6 on

16  October 24, 2009, was actually acquired by Renegade Guns & Loans LLC on October 8,

17  2009, and transferred/sold to Roy ALLOWAY on October 8, 2009.  This quick

18  turnaround of the firearm by ALLOWAY is an indication that other firearms (of the 163

19  total) he acquired from Renegade Guns and Loans are being sold in the same fashion.

20       66.    As noted above, an FFL, operating as a sole proprietor, can transfer

21  firearms to themselves to add to their personal collection, but those firearms must be kept

22  in their personal collection for at least one year before being sold.  Thus, even if an FFL

23  wanted to sell guns from his/her personal collection they are entitled to do so.  However,

24  attending every gun show and selling a high volume of firearms meets is not consistent

25  with the sale of personal firearms from one's personal collection.  It appears that

26  ALLOWAY is purchasing firearms through Renegade Guns and Loans then transferring

27  them to himself and selling them at the gun shows under the guise they are "private

28  sales."

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    67.    The undercover agents observed ALLOWAY's tables on multiple

2  occasions. His table typically had from 40-60 firearms.[7] This is a high number of

3  firearms to be selling from gun show to gun show without using a license.

4    68.    Other individuals investigated for dealing without a license rarely had the

5  firearms totals that ALLOWAY had on his table at the gun show. I believe this is true for

6  two reasons. First, ALLOWAY has easier access to guns through the FFL which has

7  helped him funnel firearms from the shop to his "private sale" booth at a greater pace.

8  The second reason that ALLOWAY is using the FFL to his advantage is because of the

9  price margin. When the FFL takes in a firearm, they will do so for an amount that will

10  allow them to make a profit when they resell it. With ALLOWAY purchasing so many

11  guns through his FFL, he most likely is not paying more than the shop paid someone to

12  acquire the firearms since he is technically part of the shop. This allows ALLOWAY to

13  make a profit easier than he would if he bought a firearm from a different FFL. I am not

14  aware of any other businesses that ALLOWAY may be associated with where he could

15  store firearms, documents, or business records pertaining to the sale or acquisition of

16  firearms.

17    **DAVID DEVENNY**

18    69.    Beginning in May 2009 through the current date, the ATF has been

19  investigating David DEVENNY for unlawful dealing in firearms, in violation of 18

20  U.S.C. § 922(a)(1). This investigation was initiated in May 2009, when I received an

21  ATF Multiple Sales (MS) report that showed David DEVENNY had recently purchased

22  nine handguns from one Federal Firearm Licensee (FFL) in Tacoma, Washington.[8] The

23  MS forms list the residence in Olympia, Washington, as DEVENNY's current residence.

24  According to the ATF database, DEVENNY had purchased the following firearms in the

25

26    [7] Following the sale of firearm, an ATF UC witnessed ALLOWAY fill space on his table with another firearm he had under the table.

27    [8] As mentioned above, Multiple Sale forms are forms that a FFL has to fill out when someone

28  purchases more than one handgun within 5 business days. A copy of this form is sent to ATF after it is completed by the FFL. The information from these forms is entered into a program that ATF uses to trace firearms recovered in crimes.

Search Warrant Affidavit - SA Wallace - 23

past two years:

- January 29, 2009, four (4) handguns;
- March 4, 2009, three (3) handguns; and
- May 20, 2009, nine (9) handguns.

70.    Based upon additional research into the State of Washington's database regarding handgun sales by FFL's, I discovered that DEVENNY purchased a total of 23 handguns in the past two years from FFLs.  The type of handguns purchased included three (3) Glocks, six (6) Taurus', three (3) Smith & Wesson's, two (2) FEG's, and a few other inexpensive handguns.   All of the guns were purchased  in a used condition.[9]

71.    When DEVENNEY purchased the firearms from a FFL, he had to complete and sign an ATF form 4473.  As noted above, the purchaser fills out and signs the first page of this form.  The dealer fills out the second and third page of the form.  In the section on the second page, right above the buyer's signature there is a sentence that states "I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of the law (See Instructions for Question 16)."  Therefore, every time DEVENNY filled out and signed this form he acknowledged the wording on the form and was informed of the definition of a engaging in the business of dealing firearms.

72.    In 2007, I investigated a Canadian resident who was buying multiple guns from DEVENNY at gun shows. As part of that investigation, I made contact with DEVENNY and inquired about the guns that were recovered.

73.    On October 17, 2009, Special Agents with ATF conducted an undercover operation at the gun show located at the SW Washington Fairgrounds near Centralia, Washington.  Prior to entering the gun show, I briefed ATF UC-2, who was working undercover, that DEVENNY may be present at the show.

74.    UC-2 entered the show and saw DEVENNY at a table which had

_____

[9]   Based upon my review of MS records, I learned that since May of 2009, DEVENNY has purchased an additional 12 handguns through MS records.  I believe that he has purchased other firearms from private parties. Since no records are required for private sales, the exact number of firearms cannot be ascertained.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  approximately fifteen handguns and eight long guns displayed for sale. DEVENNY was

2  wearing a name tag with the name "Dave" and the words "buy estate" on his tag. Special

3  Agent UC-2 initiated a conversation with DEVENNY. During the conversation,

4  DEVENNY stated that he had sold 14 firearms at the last gun show. DEVENNY also

5  stated that he would be at the next gun show in Puyallup, which is considered a major gun

6  show in the State of Washington.[10] DEVENNY explained that he had been buying and

7  selling firearms for approximately seven years and that he makes "decent" money selling

8  guns.

9         75.    UC-2 asked DEVENNY about the "buy estate" wording on his tag.

10  DEVENNY explained it means that he purchases firearms from estate sales and re-sells

11  them. DEVENNY also pointed out that not all the firearms on his table belonged to him.

12  He stated that a few long guns belonged to a younger male that was present at the table,

13  but to whom UC-2 did not speak. (This person was later identified as David McQuain).

14         76.    After browsing DEVENNY's table, UC-2 bought one Taurus, model 445,

15  .44 caliber revolver with serial number QG548076 for $395. Prior to completion of the

16  sale, DEVENNY asked UC-2 if he was a Washington resident, but did not ask to see any

17  identification. DEVENNY gave UC-2 a receipt for the purchase of the handgun.[11]

18         77.    On October 24, 2009, UC-2 went to the Washington Arms Collector

19  (WAC) gun show held in Puyallup, Washington. He approached DEVENNY's table

20  which had approximately 20 handguns and 10 long guns. DEVENNY remembered UC-2

21  from the previous show. David McQuain, who was at the last gun show, was also present

22  behind the table.

23         78.    UC-2 learned from DEVENNY and McQuain and that the majority of the

24  handguns belonged to DEVENNY and the majority of the long guns belonged to

25  _____

26  [10] The organization who is responsible for the gun show, the Washington Arms Collectors
    (WAC) advertise the show as "The Big One."

27  [11] At the Centralia gun shows, a receipt is required with every firearm sale so the person
    working at the exit can verify that the person walking out the door purchased the firearm they are leaving
28  with. A receipt of this nature was completed by DEVENNY, but no other paperwork was provided to the
    UC.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  McQuain.  There was also a sign at their table that read "Private Sale."   UC-2 purchased

2  a FEG, model GGK45, .45 caliber pistol with serial number AA006230 for $450.  No

3  paperwork was completed for the sale, but DEVENNY did ask to see UC-2's Washington

4  drivers license.  While completing the purchase, DEVENNY stated that he quickly sells

5  the guns he buys.  He also stated that he would be interested in purchasing any firearms

6  that UC-2 was willing to sell.  DEVENNY pointed out that the firearm that UC-2 was

7  purchasing had never fired and he (DEVENNY) purchased it from an unnamed source

8  only to resell it.

9       79.    Also, October 24, 2009, during the same gun show in Puyallup, UC-6, also

10  visited DEVENNY's table to purchase a firearm.  UC-6 noticed that DEVENNY was

11  wearing a Washington Arms Collector Membership badge with the name Dave

12  DEVENNY and that a note was attached that mentioned buying estates.  UC-6 saw

13  approximately 40 handguns and 10 long guns at the table.

14       80.    UC-6 struck up a conversation with DEVENNY.  During that conversation,

15  DEVENNY stated that he was not a collector, but a "recycler," and that he "probably

16  shouldn't say that too loud."  DEVENNY went on to say that he had been buying and

17  selling firearms for some time and that "they" can't do anything about it.  I believe that

18  the reference to "they" means the ATF, because he knows that ATF regulates licensed

19  dealers and the federal firearms laws.

20       81.    UC-6 bought a Ruger, model SP101, .357 caliber revolver with serial

21  number 573-53480 and a holster for $475.  During the purchase, DEVENNY stated that

22  it was the second firearm he had not expected to sell that morning.  UC-6 asked

23  DEVENNY if that meant he was holding guns for other people and to which DEVENNY

24  replied "something like that."  I believe this meant that DEVENNY had pre-arranged a

25  few sales of firearms to other individuals for whom he was just waiting to stop by to

26  purchase the firearms.

27       82.    On November 14, 2009, UC-5, working undercover, contacted David

28  DEVENNY at the WAC Gun Show in Puyallup, Washington.  DEVENNY told UC-5 that

1    all of the firearms on his tables were used and he did not know the specific history behind

2    the firearms ownership. DEVENNY said he frequently had tables at the Puyallup and

3    Centralia gun shows as well as other gun shows in the Seattle/Tacoma area. DEVENNY

4    went on to say that he will go to Port Angeles to sell at the gun show but that he would

5    not go to the Monroe Gun Show.

6         83.    While speaking with Special Agent UC-5, another customer, "Terry,"

7    approached DEVENNY and stated, "your table grows every time." DEVENNY

8    immediately recognized "Terry" and the two discussed the idea of "Terry" buying/selling

9    one or more firearms from each other in the future at DEVENNY's home. DEVENNY

10   told "Terry" he could not purchase a firearm at the show without being a member.

11        84.    UC-5 purchased a Star, model 30PK, 9mm pistol with serial number

12   163448 for $350. DEVENNY confirmed that UC-5 was a WAC member by looking at

13   his name tag and then checked his Washington State license for residency verification.

14        85.    On December 5, 2009, UC-4, working undercover, contacted David

15   DEVENNY at the Centralia/Chehalis gun show at the Southwest Washington

16   Fairgrounds. UC-4 approached DEVENNY's table and started a conversation with him

17   regarding the guns at his table. DEVENNY told UC-4 that he was not required to

18   complete any paperwork except the receipt that was required by the gun show. He also

19   stated that he was a private collector, but not a collector of any particular kind of firearm.

20   DEVENNY explained that he has bought various firearms and sells them at the gun

21   shows and referred to himself as a "recycler," in that he bought guns from one person and

22   recycled them to another person.

23        86.    DEVENNY further explained that he kept very few records. He then patted

24   a wad of folded papers in his pocket and said that he kept track of how much he paid for a

25   particular firearm on those papers. He stated that when he sold a firearm on his list he

26   would dispose of the information. He told UC-4 he did not want the government

27   pursuing him for taxes on his firearms sales. He stated that he did not want ATF to know

28   how many firearms he bought and sold because he believed that ATF might conclude that

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  he was buying and selling too many firearms. DEVENNY also mentioned that he has

2  some computer records of his activities at home, but they were limited for fear of

3  government action against him.

4       87.    UC-4 asked DEVENNY how many firearms someone could sell without

5  needing to get a license. DEVENNY stated that there was no particular number of

6  firearms required for someone to obtain a firearms license. DEVENNY told UC-4 that

7  the paperwork an FFL (Federal Firearm Licensee) had to deal with was a hassle and that

8  the only upside is that an FFL was able to purchase a firearm at wholesale and run a

9  storefront.

10       88.    DEVENNY told UC-4 that there were only a few things that he had to

11  confirm in order to sell to someone at a gun show. First, he had to check the person's age

12  to make sure they were 18 years of age to purchase a long gun or 21 years of age for a

13  handgun. Second, that the buyer was a Washington State resident. Lastly, whether or not

14  the subject was a convicted felon. However, DEVENNY said that he did not actually

15  care if someone was a felon, that he just did not want to know about it. DEVENNY also

16  mentioned that he watches out for straw purchasers.[12] Again, DEVENNY said that he

17  was not opposed to selling to someone who was not the actual purchaser, but that he just

18  did not want to know about it. DEVENNY added that he never knew if someone from

19  ATF would be standing by listening to a straw purchase transaction or to a sale to a felon

20  and he had to watch his own back.

21       89.    Special Agent UC-4 purchased a Taurus, .38 caliber revolver with serial

22  number ZL12729 from DEVENNY. DEVENNY asked to see UC-4's identification.

23  DEVENNY told UC-4 that he had purchased that firearm the day before from an FFL.

24  He went on to explain that it was a special order for someone who was did not pass the

25  FBI background check. Since the guy who special ordered it could not receive it the FFL

26  sold the gun to DEVENNY.

27

28      [12] A straw purchaser is when someone buys a gun with the intention of giving it to someone else (the real purchaser) that could not buy the firearm. By definition the term straw purchaser refers to sales through FFL's, thus showing that DEVENNY knows what FFL's look for when conducting sales.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1      90.    I ran a check on the Taurus, .38 caliber revolver with serial number

2  ZL12729 which Special Agent UC-4 had purchased from DEVENNY. The records

3  confirmed that DEVENNY purchased the firearm on December 4, 2009, from a FFL in

4  Covington, Washington.

5      91.    On January 14, 2010, David DEVENNY called UC-2 to let him know that

6  he had a Taurus, model "The Judge" handgun for sale. Back on October 17, 2009, UC-2

7  had spoken to DEVENNY about this particular handgun and asked DEVENNY if he

8  could find one for him. DEVENNY told UC-2 that he would sell the handgun for $500

9  and that he could possibly get a second "Judge" from a friend who is an FFL. The UC

10 told DEVENNY that he would think about it and get back to him.

11     92.    On January 15, 2010, DEVENNY called UC-2 again and left a message

12 identifying himself as "Handlebar Dave," which is an alias he has used in the past. The

13 message stated that he could get a second "Judge" and that the first Judge he could sell

14 for $500 and the second he could sell for $525 for a total of $1,025.

15     93.    On January 21, 2010, UC- 2 returned DEVENNY's call and asked if he still

16 had the Taurus, model "The Judge" handgun for sale. DEVENNY stated that he still had

17 it and that he would sell it to UC-4 at his residence. Both parties agreed to meet on

18 January 22 at DEVENNY's residence in Olympia, Washington.

19     94.    On January 22, 2010, UC-2 went to DEVENNY's residence located at 9610

20 SE Highway 99, Olympia, Washington to purchase "The Judge" firearm. The meeting

21 between UC-2 and DEVENNY lasted approximately one hour. During this meeting

22 DEVENNY claimed that he has been selling firearms for approximately eight (8) years

23 and averages about two shows a month.

24     95.    When UC-2 asked DEVENNY what types of firearms he had for sale,

25 DEVENNY read off approximately 43 firearms by name from a list he had in his shirt

26 pocket. DEVENNY would not allow UC-2 to see the list because he did not want UC-4

27 to see how much he paid for each weapon. DEVENNY told UC-2 that he is not a

28 "dealer" (making hand gestures showing quotation marks), but that he has to make money

Search Warrant Affidavit - SA Wallace - 29

1    from selling firearms.  UC-2 asked DEVENNY if he would make more money if he was a

2    licensed dealer.  DEVENNY replied no and elaborated further by discussing the

3    paperwork involved and about conducting NICS (National Instant Check System)

4    transactions for each sale.

5         96.    UC-2 told DEVENNY that he had a co-worker who wanted a firearm but

6    was unable to legally purchase a firearm due to a domestic violence conviction.

7    DEVENNY stated that he didn't "give a shit" and that he would sell a gun to UC-2's

8    friend.  DEVENNY reiterated that he doesn't ask the question whether the buyer can

9    legally have the firearm.

10        97.    During this conversation, DEVENNY admitted that he had sold the gun that

11   was used to murder Seattle Police Officer Brenton.[13]  DEVENNY explained that he could

12   not say to whom he sold the gun but that he knew he sold that gun at the Puyallup gun

13   show.  DEVENNY stated that he was contacted by the Seattle Police detectives following

14   the shooting.  The detectives were able to trace the gun to him because DEVENNY had

15   purchased the gun from the original owner.  DEVENNY was unable to tell the police to

16   whom he sold the gun because he claimed not have kept any record of the sale.

17        98.    UC-2 purchased two firearms from DEVENNY: a Taurus, model The

18   Judge, .45/.410 caliber revolver with serial number CS816896, and a Sig Sauer, .45

19   caliber pistol with serial number G287194.  Before leaving, UC-4 again asked

20   DEVENNY about bringing his friend who had the domestic violence conviction to his

21   house to purchase a firearm.  DEVENNY replied, "I really don't care, don't ask, don't

22   tell.  If I don't know, then there is nothing wrong with it."

23        99.    On February 5, 2010, UC-2 and ATF CI #291 met David DEVENNY at his

24   residence to purchase firearms.  CI#291 was posing as UC-2's coworker with the

25   domestic violence conviction.  During this conversation DEVENNY told UC-2 and CI#

26   _____

27        [13]  On October 31, 2009, Seattle Police Officer Timothy Brenton was shot to death while
     patrolling in the Central District of Seattle, Washington.  Christopher Monfort is currently facing a
28   capital murder charge in King County.  It is my belief that this gun was sold at the October 24, 2009
     Puyallup Gun Show, one week before Officer Brenton's murder.

Search Warrant Affidavit - SA Wallace - 30

1   291 that he had recently purchased an additional fifteen (15) firearms and had two deals
2   scheduled to take place the following day.  DEVENNY said that he buys almost anything
3   as long as he can make a dollar selling it.  DEVENNY also stated that the only gun he
4   "collects" is made by the Wilkerson Firearms company.

5         100.   CI#291 attempted to tell DEVENNY that he got into some trouble, but
6   DEVENNY cut him/her off and stated, "I don't want to hear about it, I am not supposed
7   to know about it, and I don't ask that question.  Just as long as you forget where it (the
8   firearm) comes from."

9         101.   Another topic that DEVENNY and UC-2 talked about involved the prices
10   of firearms.  During this conversation, DEVENNY explained how he used a couple of
11   books he possessed to determine the value of guns he intended to buy or sell.  He pointed
12   out that a "picture book" he had was usually a little lower on values than the Blue Book
13   of Gun Values.  The Blue Book of Gun Values he says usually has higher prices and no
14   pictures to compare.  "I hardly use the books anymore to come up with a value for guns
15   because I have started to focus more on handguns."

16         102.   DEVENNY told UC-2 that he had two "deals" set up for the next day.
17   DEVENNY stated that on one deal he was going to receive a Smith & Wesson for a
18   Glock.  UC-2 commented "You don't like Glocks?"  DEVENNY agreed but stated that is
19   what sells so he will buy them.

20         103.   DEVENNY stated that besides Wilkerson guns, he has "never collected
21   guns."  He went on to say that anything he purchases, goes in the "recycling bin."  Based
22   upon his prior statements, I believe this to mean that DEVENNY only buys firearms to
23   resell them to someone else (i.e. to recycle them).

24         104.   UC-2 asked DEVENNY to see a the firearms they spoke about on the phone
25   before the meeting.  The guns mentioned to UC-2 were Glocks that were previously used
26   by the Detroit Police Department.  DEVENNY stated that he has four of them (referring
27   to the Glocks), but that one was already sold.

28         105.   DEVENNY sold CI#291, two firearms, one Glock, .40 caliber pistol with

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  serial number 04994DPD for $475 and one Norinco, model SKS, 7.62x39mm caliber rifle

2  with serial number 10449811 for $400. UC-2 purchased one Glock, model 22, .40 caliber

3  pistol with serial number 04597DPD for $475.  DEVENNY was paid $1,350 dollars for

4  the three firearms.

5      106.   As UC-2 and CI# 291 were leaving, DEVENNY stated that he never really

6  knows what he is "going to have from day to day." He explained that he bought "seven

7  guns Monday or Tuesday and those four Glock's" and "four or five other guns since you

8  were here last time." He also stated that he was going to attend "a Gun show in Centralia

9  in about a week or so, which means my inventory will change again."

10      107.   DEVENNY also claimed that he bought about "$30,000 worth of guns"

11  from a guy down in Longview, Washington over a few month period. DEVENNY

12  reminded CI#291, "If it comes along that someone catches you and raises hell with you,

13  you don't know where those came from, just keep that in mind. I don't need the SWAT

14  team here at the yard again."

15      108.   I queried the serial number of firearms purchased from DEVENNY through

16  the ATF tracing database. I discovered that the two handguns had been purchased from a

17  FFL in January 2010. The Glock pistol with serial number 04597DPD was purchased on

18  January 29, 2010, and the pistol with serial number 04994DPD was purchased on January

19  25, 2010.

20      109.   On May 22, 2010, UC-4 working undercover, attended the gun show in

21  Centralia, Washington. While walking through the show, he observed DEVENNY

22  behind a table that had a private seller sign. While UC-4 was looking for guns at the

23  table, DEVENNY pointed out one of the guns and offered to lower the price.

24  DEVENNY explained that he had been carrying the firearm around to gun shows for too

25  long and was willing to give UC-4 a good price on it. DEVENNY told UC-4 that the

26  manufacturers paperwork was in the gun box for that particular weapon.

27      110.   DEVENNY stated that he did not have to do any paperwork for the sale of

28  the firearm other than the receipt required by the gun show. DEVENNY said that he fills

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   out the receipt for the buyer, but that he doesn't keep a copy for himself. He said that by

2   not keeping a copy of it, there was less for "Uncle" to come looking for. I believe the

3   reference to "Uncle" meant "Uncle Sam" or the federal government from whom he was

4   trying to hide his gun sales. DEVENNY told UC-4 that all the firearms he had on the

5   table were paid for from his earnings he made over an eight year period of working at gun

6   shows. He said that he did not have any household money invested in his inventory.

7   Special Agent UC-4 did not buy a gun on this occasion.

8       111.   On July 1, 2010, I received information back from the Employment Security

9   Department Records Disclosure Unit that showed DEVENNY had no employment history

10   for the years 2008-July 2010. In 2007 the records indicated that he worked 306 hours and

11   made about $6,800. I am not aware of any businesses that DEVENNEY may be

12   associated with where he could store firearms, documents, or business records pertaining

13   to the sale or acquisition of firearms.

14       112.   On October 18, 2010, I checked with an ATF Industry Operation

15   Investigator to see whether David DEVENNY had ever applied or received a Federal

16   Firearms License. ATF Industry records revealed that they had no records of David

17   DEVENNY ever receiving a license, or attempting to receive a license. For someone in

18   the State of Washington to obtain a federal firearms license they must also apply for and

19   be accepted to receive a state license to sell firearms. A search of Washington State's

20   Department of Licensing database showed no firearms licenses issued to David

21   DEVENNY.

22                                   **CONCLUSION**

23       113.   Based upon my training and experience, I know that it is common for

24   individuals who engage in the unlawful dealing of firearms to store their records, such as

25   purchase orders, sales receipts, ATF form 4473 for the purchase of firearms from a FFL,

26   photographs of firearms, and inventory sheets. Unlike federal firearms licensees, who

27   have a storefront, I am not aware that any of the subjects of this warrant have a store front

28   or other location from which they deal firearms. I am further unaware of any other

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  businesses associated with any of the subjects of this investigation and the subjects are

2  not known to be employed outside of their residences. Thus, I believe that any records or

3  documents relating to the purchase, sale, or acquisition of firearms would therefore be

4  stored in their residences. The subjects herein sell their firearms at multiple local gun

5  shows and do not have any other location from which they conduct business.

6      114.   In my experience, individuals who possess firearms will keep the firearms

7  stored in gun safes at their residences. As noted above in paragraph 8, when SKILES

8  applied to become an FFL in 2003, he indicated that he intended to store his firearms in a

9  commercial gun safe in the bedroom of his residence. Further, given the value of the

10  firearms, the size of the collection of firearms, the unlawful firearms dealer will want to

11  keep the firearms in a secured location. For example, as noted above, DEVENNY stored

12  his firearm inventory, in two gun safes, at his residence. Also, UC-4 contacted another

13  individual suspected of unlawful firearms dealing, at one of the gun shows. This

14  individual stated that he had built a walk-in gun safe in his residence in which he stored

15  approximately three hundred (300) firearms.

16      115.   When SKILES operated as an FFL, he listed his home address as his place

17  of business. According to ATF regulations, an FFL can only operate their business at the

18  location listed as their place of business or at a gun show. An FFL is authorized to store

19  their inventory of firearms at an outside location, but that location must be noted in their

20  licensing paperwork and approved by the ATF. There is no record of SKILES seeking

21  approval to store the weapons in a location other than his residence. It would have been

22  in violation of ATF regulations for SKILES to have stored the firearms at another

23  location, such as a storage locker, without ATF approval.

24      117.   As referenced above, in 2007, when GUSSONI had a state business license

25  for Soner Construction, he listed his personal residence as the place of business.

26      118.   Given the frequency that SKILES, GUSSONI, ALLOWAY, and

27  DEVENNY attend gun shows, the firearms must be easily and quickly accessible since

28  they have to transport the firearms to and from the gun shows which are located through

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  out the Western District of Washington.  Thus, for convenience reasons, I believe the

2  subjects store the firearms at their residence, as well as the documents pertaining to their

3  acquisition.

4        119.  ALLOWAY he has purchased numerous firearms from and through,

5  Renegade Guns and Loans.  Once he purchased the firearm from Renegade Guns and

6  Loans, by ATF regulation, he had to physically remove the firearms from that location.  I

7  believe that ALLOWAY stores the firearms at his residence.

8        120.  SKILES, GUSSONI, ALLOWAY, and DEVENNY, each reside in houses

9  large enough to store their inventory of firearms.

10        121.  I am aware that the Ninth Circuit in *United States v. Angulo-Lopez,* 791

11  F.2d 1394 (9th Cir. 1986), held that direct evidence that contraband or evidence is at a

12  particular location is not essential to establish probable cause to search the location.

13  Further, I am aware that "[i]n the case of drug dealers, evidence is likely to found where

14  the dealer lives." *Id.* at 1399.  Further, that a magistrate judge "is entitled to draw

15  reasonable inferences about where the evidence is likely to be kept, based on the nature of

16  the evidence and the type of offense." *Id.*  It is not necessary for the magistrate judge to

17  determine that the evidence sought is in fact on the premises to be searched.  *United*

18  *States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir. 1985).

19        122.  I am also aware that the Eleventh Circuit in *United States v. Anton,* 546

20  F.3d 1355, 1358 (11th Cir. 2008), held that a warrant to search a residence for evidence

21  of firearms possession and firearms dealing was supported by probable cause when the

22  affidavit established that (1) federal agents had observed the defendant with firearms at

23  several gun shows; (2) a confidential informant indicated that the defendant would attend

24  a specific gun show and had claimed to be in possession of over 300 firearms; and (3) that

25  based upon the federal agent's experience, convicted felons and firearms dealers

26  possessing contraband typically store these items on their property.

27  //

28  //

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

//

123.    Based on the foregoing, I respectfully submit that probable cause exists to search the subject residences described more particularly in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § 922(a)(1)(A) and 924(d).

HEIDI WALLACE, Affiant
Special Agent, Bureau of Alcohol, Tobacco,
Firearms and Explosives

SUBSCRIBED AND SWORN to before me this _17m_ day of November, 2010.  3:45 m.

J. RICHARD CREATURA
United States Magistrate Judge

Search Warrant Affidavit - SA Wallace - 36